Statement of the Case.
MONROE, C. J.
The city of Shreveport, assuming to proceed under the authority of Act No. 210 of 1914, caused considerable street paving to be done in its “Exposition Heights subdivision,” and thereafter brought this suit to obtain recognition against certain abutting lots owned by defendant of the lien and privilege, accorded by the statute for the proportion of the cost due by the lots. Defendant made no appearance, but the Natalie Oil Company and Mr. M. Kaufman intervened, as holders of notes secured by mortgage and vendor’s privilege on the lots in question, which mortgage they were then in the act of foreclosing, and did subsequently foreclose, and it was agreed that their intervention should stand as their answer to plaintiff’s petition; the original defendant being tacitly eliminated. They set up various grounds of opposition to plaintiff’s demand, but in this court are urging practically but one, viz., that the work done was and is of no benefit to the property and hence was unauthorized by Act 210 of 1914, and that to enforce the alleged lien for the cost would amount to a taking of the property without due process of law. There was judgment in the court a qua establishing the amount due and recognizing and enforcing against the lots the special lien and privilege accorded by the statute therefor, and the interveners have appealed.
The work of paving is shown to have been done by the Healy Construction Company, under a contract with plaintiff of date, as we assume, September 3, 1914, and a certain guaranty by the original defendant (Hester) which was annexed thereto; but we find neither the contract nor the guaranty in the record, and we might have some difficulty in considering the case were it not that the appellants appear to concede all that could be shown by those instruments and rely upon the defense as above stated, and the evidence by which they conceive it to be supported.
It appears from that evidence that the “Exposition Heights subdivision” is as yet somewhat remote and unfrequented, and we infer that the idea of paving it, with a view *498 of bring it nearer in point of accessibility to the marts of trade or the habitations of man, and of rendering it more desirable when reached, originated with the owners, rather than .with the city. Thus we find the following in the well-considered opinion of our learned brother of the district court, to wit:
“An examination of the original contract between the city of Shreveport and the Healy Construction Company * * * shows that said contract was entered into * * * on the 3d day of September, 1914. This contract expressly states that: ‘Payment for the work herein proposed shall be as follows: The city to pay 90 per cent, of its entire proportion in cash when the entire street is graveled, sprinkled, and rolled and is thrown open for traffic, and the remainder of its portion upon final acceptance^ of the street by the city council. The abutting property owners and the street railway companies are to have the option of paying their respective amounts. * * * ’ On the same day, to wit, September 3, 1914, the following letter, signed by J. G. Hester, was addressed to the mayor and council: ‘ * * * In consideration of the execution of contract for paving with gravel Alabama avenue, Boss avenue, and Sumner street, I hereby agree to pay for all intersections * * * which are chargeable against the city.’
“At the bottom of this letter we find the following: ‘Accepted. We hereby accept the above agreement of J. G. Hester to pay for the intersections in Alabama avenue, Boss avenue, and Sumner street, and to hold the city harmless from the payment of the above intersections, and accept J. G. Hester’s personal obligation to pay same. [Signed] Healy Construction Company, by S. B. Lawrence, Jr.’
“We also find the following letter, signed by J. G. Hester and addressed to the mayor and council: •
‘In requesting the city to advertise for bids and to let contract for graveling streets in Exposition avenue, I agreed to pay for the intersections chargeable to the city. The council has agreed to accept my agreement to do this without putting up security for the same, "upon acceptance of said guaranty by the contractors. I hand you herewith the guaranty, accepted by the Healy Construction Company.’
“This agreement and letters are annexed to the contract between the city and the Healy Construction Company for the paving with gravel of the above-named streets.”
The contract price for the work appears to have been 92 cents per square yard.
The work was completed and accepted by the city probably in December, 1914. This case was tried on May 6, 1915.
There were btit two witnesses called to the stand. Mr. J. H. Boss (called by defendant) testified that he owned property on Alabama and Sumner streets and Boss avenue and that he had examined those streets on the morning of the trial; that in several places they were badly washed; that there had been very little travel on some of the streets, and the top of the ground seemed to be soft, and that in other places which had been traveled over the dirt had become pretty well packed. He found generally, as we understand his testimony, that the surfaces of the streets had been .washed from the middles to the sides, leaving about one-third available for use, and even that had to be used carefully, as there were ditches.
Mr. George Wilson (called by plaintiff) succeeded to the office of city engineer just after the completion of the work, and it devolved on him to receive it, a duty which he does not seem to have relished particularly, though he concedes that the work was done according to the contract, and based his dissatisfaction upon the opinion that gravel was not the kind of paving to lay in mud streets that were not used. His testimony reads, in part, as follows:
“Q. Now, I notice this contract calls for 92 cents per yard? A. Yes, sir. Q. State whether at that time they could have done a better job than that for 92 cents a yard. A. I don’t think so; I think — I don’t think they made much money out of it. * * * Q. Did you examine the work after it was finished? A. Yes, sir. Q. In what condition did you find it? A. In pretty good shape. Q. Was that a now subdivision just opened? A. Yes, sir; isolated, too. Q. What would you say would be the present condition of that gravel if it had had much traffic over it constantly, .every day since its completion? A. Well, I think it would have been all right.
On cross-examination:
“Q. Now, in your report of December 8, 1914, you say, as city engineer, that the work done was utterly useless? A. Yes, sir. Q. What did you mean by that? A. Well, I don’t believe in graveling in cities; on good roads that is all right, where the traffic is confined to a narrow path, and it seems to me that this was useless, and has proven so on King’s Highway.”
*500 Opinion.
* [1] Section 1 of Act 210 of 1914 provides that the authorities of any town or city in the state having a population exceeding 1,-000 (city of New Orleans excepted) and all incorporated parish seats shall have—
“the power to pave, gravel, macadamize, resurface, repair, or otherwise improve the streets and alleys, or any part thereof, not less than one block, within the corporate limits, and shall have the power to levy and collect special taxes or local assessments on real estate abutting the street or alley to be improved, for the purpose of defraying a part of the cost of such work, repair or improvement, as hereinafter provided.”
And then follow provisions in regard to the apportionment and collection of the costs of the work, etc.
Under section 2 the work may be done (as it appears to have been done in this instance) upon the petition of the property holders, and in such case it must be done as set forth in the petition, which means that the property holders are then entitled to the kind of pavement they ask for. Section 4 reads in part:
“That the sum assessed against real estate and railroad track and roadbed shall be due and collectible within ten days after the completion of the work and its acceptance by the municipality, and, if not paid within ten days, the municipal authorities shall have the power to proceed by suit against the said owners and said real estate, * * * to collect the delinquent assessments, and said municipality and its transferees shall have a special privilege on said property * * * to secure the payment of the sum assessed against it, with eight per cent, per annum interest thereon from the expiration of said ten days until paid, which privilege shall be a first privilege over and above all other claims, except taxes, and shall affect third persons from the date of registry of the assessment in the mortgage book of the parish in which such real estate is situated.”
It will be seen from the foregoing that the questions whether any pavement shall be laid, and, if so, ,what kind of pavement, are left, on the one hand, to the municipal authorities, if they take the initiative, and, upon the other, to the property holders, and that neither the creditors of the municipality nor of the property holders, whether mortgage creditors or otherwise, are required to be consulted.
[2] If (as was done in this instance) the property holders ask for a cheap pavement that is unsuitable for the street upon which it is to be laid, the municipal authorities let the contract, the contractor lays the pavement in accordance therewith, and, though its unsuitableness be thereafter demonstrated, the property holders have only themselves to blame, and neither they nor their mortgage creditors have any standing to contest the enforcement of the lien for the cost.
The judgment appealed from is therefore affirmed.